MAYBERRY *v.* PENN.

4-6177                                    146 S. W. 2d 925

Opinion delivered January 27, 1941.

*John W. Nance* and *Earl C. Blansett,* for appellant.

*Duty & Duty,* for appellee.

HOLT, J.   October 24, 1921, Clyde Penn, appellee, sold certain farm property in Benton county, Arkansas, to William Salter, Lucia Salter, L. N. Barnes and Elsie V. Barnes, receiving as part consideration three notes of $1,000 each, due one, two and three years, respectively, from their date.   Each of these notes was signed by these four parties as makers.

January 6, thereafter, appellee Penn sold the three notes to appellant, A. B. Mayberry, indorsing each note

on the back "Clyde Penn." Each note was identical except as to the due date, and usual in form, except that each contained the following recitals:

"The drawers and indorsers severally waive presentation for payment, protest and nonpayment of this note. We, the indorsers and sureties, hereby grant to any holder of this note the right to grant extensions without notifying us, or either of us, hereby ratifying such extensions and remaining bound on this note as if no extensions had been obtained."

The makers of these notes kept them alive with interest payments up until 1936 when default was made, and on June 12, 1939, appellant Mayberry filed suit on the three notes against the four makers, *supra,* and also against appellee Penn and his wife.

Although duly served with summons, appellee Penn did not appear and defend the suit, and on October 19, 1939, more than four months after service of summons upon him, judgment by default was taken against him in this foreclosure suit.

April 8, 1940, following the expiration of the term of court at which the default judgment was entered, appellee filed suit in the Benton chancery court to set aside the judgment rendered against him on the notes in the foreclosure action. As grounds for the relief prayed he invoked the provisions of subsection 7 of § 8246 of Pope's Digest as follows:

"Section 8246. The court in which a judgment or final order has been rendered or made shall have power, after the expiration of the term, to vacate or modify such judgment or order: . . . Seventh. For unavoidable casualty or misfortune preventing the party from appearing or defending. . . ."

Appellee further alleged as a meritorious defense on the three notes in question, the bar of the five-year statute of limitations (§ 8933, Pope's Digest).

Upon appellant's demurrer to appellee's complaint and amendment thereto being overruled, answer was filed denying all material allegations.

Upon a trial the chancellor found "that the plaintiff herein has suffered said judgment to go against him by reason of his said agreement, conference and understanding with said attorney, and by reason of said attorney not having notified him, as the court finds from the evidence should have been done, that unless said deed of conveyance were procured by a certain, definite date, judgment would be sought on the above mentioned foreclosure suit. On account of this the court finds that in equity and good conscience, said judgment should be canceled, set aside and held for naught," and entered a decree accordingly. This appeal followed.

The record reflects that appellee filed suit to set aside the decree of the Benton chancery court, after the term during which the decree was rendered had terminated.

Before he would be entitled to this relief, it devolved upon him to bring himself within the provisions of subsection 7 of § 8246, Pope's Digest, upon which he relies. He must not only prove by a preponderance of the testimony that he was prevented from making his defense by unavoidable casualty or misfortune, but he must in addition allege and prove a meritorious defense. *Capital Fire Ins. Co.* v. *Davis*, 85 Ark. 385, 108 S. W. 202.

On the question of unavoidable casualty or misfortune, the record reflects that immediately upon being served with summons in the foreclosure suit, appellee, Clyde Penn, went to appellant's attorney, E. C. Blansett, to ascertain why he had been sued, and quoting from appellee's testimony:

"He told me that he had to bring me in as a party to the suit. I said, 'Why bring me in?' He said, 'I have to do that.' He said, 'I don't want this to cost you anything, because I don't want to see you get in bad, but what I want you to do is go to Barnes and help me get a deed for the place.' I said, 'I'll do all I can.' That very day I went to see Mr. Barnes and talked to him about it."

Penn further testified that he had known Mr. Blansett for years and they had been, and still are, the best

of friends. "Q. What conversation did you have with Mr. Barnes? A. We talked it over. He said, 'I would not let that cost you anything.' I said, 'I don't feel that you have any equity in that place, and why don't you give a deed and that will clear us all?' He said, 'I may be able to do something with it, make a raise or take care of it right away.' Q. Did you report that to Mr. Blansett? A. Yes. Q. When did you see Mr. Barnes again? A. Not very long after that. I saw him several times, and talked to his wife, too. Q. When did you talk to her? A. It was up in the fall. The last time I talked with him I should ,say was after the first of the year. Q. Mr. Penn, state to the court whether or not you had other talks with Mr. Blansett? A. Yes, if I remember right it was one Sunday morning. He came in the Rogers Tire & Battery Shop. He called me 'Red.' He said, 'Red, it looks like you're laying down on me getting this deed signed.' I said, 'I've done everything I can, it looks like, but I still believe we can get it done.' He says, 'I don't want it to cost you anything, but I want the deed.' . . . To the best of my knowledge that was along in January of this year. . . . Mr. Greenwood and Everett Nail were present. . . .

"Q. State to the court when you first learned that judgment had been taken against you? A. Close to two months ago. I bought a place there in Rogers and when my deed was put on record I found out that there was a judgment against me. . . .

"Q. State whether or not, had it not been for the agreement had with Mr. Blansett, you would have employed an attorney and defended the Mayberry suit? A. That is right. . . . It looks like I would be crazy and ought to be in an asylum, knowing there was a judgment against me and putting the deed on record; if I'd known there was a judgment there I wouldn't have— . . . As far as I knew the place had been cleared up years ago. I didn't have no record on it."

R. N. Greenwood and E. C. Nail gave testimony which tended to corroborate appellee.

On behalf of appellant, we quote from E. C. Blansett's testimony:

"Mr. Penn came to my office soon after summons was served on him. . . . As I remember, before the suit was filed, I had authority about the 6th day of May to accept a deed from Mr. Barnes, and Barnes refused to give Mr. Mayberry a deed in satisfaction of the mortgage that he held against him. I couldn't say definitely whether I talked to Mr. Penn in May about it, but I think it was at that time or immediately after summons was served, Mr. Penn discussed with me the deed in question, and he acted very strange and surprised and said he believed his father had fixed it up in such a way that he, Clyde, was not liable; that he indorsed it without recourse. . . . I showed him the notes and he seemed strange and seemed disturbed and said he thought Barnes had paid it. He said Mr. Mayberry was nice and ought to have his money. I think I told Mr. Penn to assist me in getting a deed from Mr. Barnes, and if he could do that we could satisfy the mortgage indebtedness. That was in May or June. . . .

"Mr. Penn immediately went to see Mr. Barnes, or I suspect he did, because he came back and reported that Barnes refused to give a deed. I asked Penn if his father would have any influence on Barnes and he said he did not know, but in about three days, Mr. H. T. Penn came to my office and spoke to me about Clyde's and Mr. Barnes' obligation to Mayberry. Mr. H. T. Penn said he would go and speak to Mr. Barnes. At the time Mr. Clyde Penn was in my office I told him I would much prefer to have a deed from Barnes than to go to the expense of foreclosing; that I didn't want to cause Mr. Clyde Penn any added expense or worry; I wanted to co-operate with Clyde and wanted him to co-operate with me. I think he did the best he could about getting a deed from Barnes."

Upon an analysis of this and other testimony, we are unable to say that the findings of the chancellor, on the question of unavoidable casualty or misfortune, are against the preponderance thereof.

We are of the view that while it is clear that Mr. Blansett in no way attempted to deceive appellee, or to

mislead him, we think appellee was justified in concluding after his various interviews with Blansett, that he would not be expected or required to appear and defend in the foreclosure suit; and that there was such a misunderstanding as constituted unavoidable casualty or misfortune which prevented appellee from appearing and defending and accordingly he was entitled to relief on the judgment under the provisions of subsection 7 of § 8246, Pope's Digest. *McElroy* v. *Underwood,* 170 Ark. 794, 281 S. W. 368.

It is undisputed from the testimony that it was the primary purpose both of Mr. Blansett and appellee, to secure a deed to the mortgaged property from Mr. Barnes, who then owned the property subject to the mortgage, without the expense of foreclosure. Appellant was willing to accept the property and relieve appellee of any personal liability on the notes and stated to appellee that he did not want it to cost him anything. Thus it appears that appellant by foreclosure may acquire title to the property, the very thing that appellee was trying to assist in procuring for him without suit. This, we think, an additional reason to warrant appellee in assuming that appellant did not intend to demand a personal judgment against him.

We come now to consider appellee's defense of the five-year statute of limitations to the three notes sued on in the foreclosure suit of June 12, 1939.

Was this defense meritorious as the chancellor found? We think it was.

The record reflects that after appellee sold and indorsed the three notes in question on January 6, 1922, to appellant Mayberry, he had nothing further to do with them. All interest payments made on the notes to keep them alive were made by one of the four original makers. Thus for almost 20 years these notes had been kept alive without any notice of extensions to appellee and without any demands upon him.

The recitals, *supra,* appearing in each of the notes, we think, had reference solely to the drawers, indorsers or parties whose names appeared on the notes at the

time of their execution on October 24, 1921, and that these parties only granted to future holders of the notes the right to grant extensions without notifying them and bound themselves to ratify any such extensions without notice thereof. This, we think, did not apply to appellee, who was in no sense an indorser of the notes at the time of their execution.

It is our view under the terms of the notes that appellee could only be bound for five years from the due date of each of these notes under the facts as presented in this record. *Trent* v. *Johnson,* 185 Ark. 288, 47 S. W. 2d 12, 80 A. L. R. 1431. We do not think the recitals contained in these notes can be construed to constitute a waiver of the statute of limitations by appellee.

Finding no error, the decree is affirmed.